UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- X

KOBRAND CORPORATION,

Plaintiff,

-v-

ABADIA RETUERTA S.A.,

Defendant.

------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED NOV 1 9 2012

12 Civ. 154 (KBF)

Opinion & Order

KATHERINE B. FORREST, District Judge:

On September 7, 2005, plaintiff Kobrand Corporation entered into an
agreement to be the exclusive distributor of three brands of wine produced by
defendant Abadia Retuerta S.A. for certain countries, including the United
States.  From 2007 through 2010 Abadia Retuerta provided to Kobrand —
and Kobrand sold — less wine than the parties anticipated in their
agreement.  On June 20, 2011, Abadia Retuerta notified Kobrand that it
would terminate the agreement effective August 31, 2011, asserting that
Kobrand failed to meet minimum sales requirements.  Kobrand then brought
suit, and Abadia Retuerta counterclaimed, both for breach of contract.  Now
before the Court are the parties' cross motions for summary judgment.

1

For the following reasons, Kobrand's motion for summary judgment is GRANTED in part and DENIED in part, and Abadia Retuerta's motion for summary judgment is DENIED.

## I.   BACKGROUND

### a.   The Agreement

On September 7, 2005, Kobrand and Abadia Retuerta entered into a distribution agreement.  (See generally Cvjetkovic Decl. Ex. 1, ECF No. 25 ("Agreement").)  Kobrand agreed to market and distribute three brands of wine in the "assigned territory":[1] "Abadía Retuerta Cuvée El Palomar" ("Palomar"), "Abadía Retuerta Selección Especial" ("Selección Especial"), and "Abadía Retuerta Rívola" ("Rívola").  (Id. at 1.)  Kobrand also agreed to sell minimum volumes of that wine at minimum prices in order to assure Abadia Retuerta a "Total SUPPLIER Annual Floor Revenue."  (See id. at 5, 11.)  These volumes and prices were explicitly negotiable.  (See id. at 11.)

Abadia Retuerta, for its part, agreed to sell Palomar, Selección Especial, and Rívola exclusively to Kobrand within the assigned territories.  (Id. at 1.)  It also agreed to provide Kobrand with at least as much wine as Kobrand was required to sell under the agreement.  (Id. at 5.)  But Abadia Retuerta was not required to provide Kobrand with that much wine if sufficient "production levels in a particular year [were] not attainable due to forces outside [Abadia Retuerta]'s reasonable control."  (Id.)  If production

---

[1] The "assigned territory" includes the United States, Canada, the Caribbean Basin, and Bermuda. (Id. at 1.)

levels were too low, however, Abadia Retuerta would not be entitled to exercise its right to terminate the contract and to receive liquidated damages, in the event that Kobrand failed to meet the Total SUPPLIER Annual Floor Revenue.  (Id.)

Although the agreement included separate floor revenue requirements for Palomar, Selección Especial, and Rívola in addition a total minimum revenue requirement, it explicitly provided that if "the compilation of floor revenues may be otherwise achieved (by adjusting the case quantities by type), it represents an equally accept[a]ble scenario." (Id. at 11.)

The agreement provided Abadia Retuerta with two other (relevant) options for terminating the contract.  First, if either party was in material default, the other party could terminate the contract after giving written notice and 120 days' opportunity to cure the default.  (Id. at 6.)  Second, even if Kobrand was not in material default, Abadia Retuerta could terminate the contract after giving one year's notice, as long as it paid Kobrand liquidated damages.  (Id.)

The three termination provisions of the contract that form the heart of the present controversy are set out in full below:

SEVENTH B:

> Notwithstanding anything in this Agreement to the contrary, SUPPLIER may, but shall not be obligated to, terminate, without penalty, this Agreement if during any year SUPPLIER does not achieve at least the Total SUPPLIER Annual Floor Revenue as set forth in Exhibit A to this Agreement.   In the event that SUPPLIER

3

terminates this Agreement in accordance with this Paragraph B, KOBRAND shall pay to SUPPLIER, as liquidated damages and not as a penalty, an amount equal to 50% of the amount by which SUPPLIER's actual annual revenues from sales of the Wine in the assigned territory for such year is less than the Total SUPPLIER Annual Floor Revenue for such year as set forth on Exhibit A to this Agreement. For its part, SUPPLIER shall be obligated to sell to KOBRAND the quantities set forth in Exhibit A unless production levels in a particular year are not attainable due to forces outside of SUPPLIER's reasonable control. In the event that the production levels in any year are not sufficient to permit SUPPLIER to provide to KOBRAND the quantities set forth in Exhibit A, SUPPLIER shall not be entitled to enforce any of its rights under this paragraph, KOBRAND shall not be obligated to meet any of its threshold requirements set forth on Exhibit A, and KOBRAND shall receive its pro rata share of the Wines vis-à-vis all other worldwide distributors of the Wine. Exhibit A may be modified as agreed by KOBRAND and SUPPLIER.

(Id. at 5.)

SEVENTH E:

Except as otherwise provided in this Agreement, either party may terminate this Agreement upon one hundred twenty (120) days' written notice to the other party if such other party is in material default of this Agreement and such default is not cured within said one hundred twenty (120) day period.

(Id. at 6.)

SEVENTH F:

Notwithstanding anything to the contrary contained herein, SUPPLIER may terminate this Agreement for any reason, on one year's prior written notice to KOBRAND; provided, however that, upon exercising such right of termination, SUPPLIER shall pay to KOBRAND, as liquidated damages and not as a penalty, the following amounts: . . . Years 3-7 of the term[,] 3 x "Profits" . . . . For purposes of this paragraph, "Profits" is defined as

4

> KOBRAND's annual profits (sales price less cost of goods sold) relating to the Wine for the most recently concluded calendar year, "Year 1" shall be the period beginning on the date hereof and ending on December 31, 2006, and each subsequent "Year" shall be the next calendar year.

(Id.)

Also of note is section Twelfth A, which explicitly prohibits amendments or modifications "except by written instrument signed by each of the parties." (Id. at 8.)

The Court includes a copy of the full agreement as Appendix A to this Opinion.

### b. The Parties' Performance

Each party argues that the other failed to live up to its end of the bargain. On the one hand, Abadia Retuerta complains that Kobrand failed to meet contract's minimum revenue requirements in any year after 2006. (See id. at 11; Valero Decl. ¶ 42, Ex. F, ECF No. 34.) On the other hand, Kobrand complains that Abadia Retuerta provided it with less wine than it was obligated to sell in 2010. (See, e.g., Cvjetkovic Aff. ¶¶ 5, 9-24, 27 & Exs. 3-4, 6-10, 12, ECF No. 25.)

Despite their fundamental disagreements, however, Kobrand fails to put forth facts rebutting several of Abadia Retuerta's central contentions about its production levels during the relevant time period. For instance, Abadia Retuerta cites to documents listing its "total production available" of Selección Especial and Rívola for the years 2006 through 2011 and of Palomar for 2006 through 2009. (See Pérez Decl. ¶¶ 17-21, Ex. K, ECF No.

35.)  While Kobrand contests the relevance of the inventory numbers and the admissibility of Exhibit K, it does not dispute the accuracy of the inventory levels set forth by Abadia Retuerta.  (See Kobrand Resp. to Abadia Retuerta's Statement of Material Facts ¶ 35, ECF No. 38.)  Nor does — or could — Kobrand dispute the fact that those "total production available" statistics show a greater volume of Palomar, Selección Especial, and Rívola combined than the volume of wine required to meet the Total SUPPLIER Annual Floor Revenue for at least the years 2006 through 2009, assuming Abadia Retuerta could use any combination of those wines to reach that revenue floor. (Compare Pérez Decl. ¶¶ 17-21, Ex. K, ECF No. 35, with Agreement at 11.)

Rather than dispute most of Abadia Retuerta's numbers, Kobrand focuses on what it claims to be limits on Abadia Retuerta's supply of those wines in 2010.  In particular, Kobrand argues that (1) Abadia Retuerta's discontinuance of Palomar by 2010, and (2) Abadia Retuerta's 2010 "allocation" of Selección Especial precluded Kobrand from meeting its annual revenue floor for that year.  (See Kobrand Resp. to Abadia Retuerta's Statement of Material Facts ¶ 35, ECF No. 38; see also Cvjetkovic Aff. Ex. 6, ECF No. 25 (discussing the allocation of Selección Especial in 2009).)

Despite Kobrand's consistently low sales, Abadia Retuerta waited years to act.  First, in December 2010, Abadia Retuerta's general manager wrote a letter to Kobrand explicitly mentioning the revenue requirements of Exhibit A and its termination rights under section Seventh B.  (Valero Decl.

Ex. C, ECF No. 34.)  Following that letter, the parties met in an effort to iron
out their differences, but to no avail.  (See id. Ex. D.)  Finally, in a letter
dated June 20, 2011, Abadia Retuerta gave notice that it was terminating its
agreement with Kobrand, effective August 31, 2011.  (Cvjetkovic Aff. ¶ 4, Ex.
2, ECF No. 25.)  In that letter, Abadia Retuerta cited as the basis of its
termination Kobrand's failure to meet the "Total SUPPLIER Annual Floor
Revenue" required under section Seventh B and Exhibit A to the contract.
(See id.; Cvjetkovic Decl. Ex. 1 at 5, 11, ECF No. 25.)

Kobrand then brought suit for breach of contract on November 15,
2011, and Abadia Retuerta invoked this Court's diversity jurisdiction to
remove the action on January 9, 2012.  (See Notice of Removal 1-2, ECF No.
1.)  Kobrand moved for summary judgment on July 30, 2012, and Abadia
Retuerta cross moved for summary judgment on August 30, 2012.  The
motions were fully briefed by October 10, 2012.

## II.   DISCUSSION

### a.  Standard on Summary Judgment

Summary judgment may not be granted unless all of the submissions
taken together "show that there is no genuine issue as to any material fact
and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ.
P. 56(c).  The moving party bears the burden of demonstrating "the absence
of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317,
323 (1986).  In making that determination, the Court must "construe all
evidence in the light most favorable to the nonmoving party, drawing all

inferences and resolving all ambiguities in its favor." Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010).

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set out specific facts showing a genuine issue for trial," and cannot "rely merely on allegations or denials" contained in the pleadings. Fed. R. Civ. P. 56(e); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir.2009). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). In addition, self-serving, conclusory affidavits, standing alone, are insufficient to create a triable issue of fact and defeat a motion for summary judgment. See BellSouth Telecommc'ns, Inc. v. W.R. Grace & Co.-Conn., 77 F.3d 603, 615 (2d Cir.1996).

In the context of contract interpretation, the standard for summary judgment is unique, because the line between fact and law is blurred. "Under New York law, 'the initial interpretation of a contract is a matter of law for the court to decide.'" Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London, Eng., 136 F.3d 82, 86 (1998) (quoting K. Bell & Assocs., Inc. v. Lloyd's Underwriters, 97 F.3d 632, 637 (2d Cir. 1996)). But the "initial interpretation" is limited to determining whether ambiguity

exists as to the contract's meaning and, if there is no ambiguity, what the contract unambiguously means. See id. Where the meaning of a contract is ambiguous, however, its interpretation is not amenable to summary judgment. Id. (citing Cable Sci. Corp. v. Rochdale Vill., Inc., 920 F.2d 147, 151 (2d Cir. 1990)). A contract is ambiguous when it could suggest multiple meanings to a reasonable, objective reader familiar with the context of the contract. See id. (citing Lightfoot v. Union Carbide Corp., 110 F.3d 898, 906 (2d Cir. 1997)). When making this initial interpretation, the Court should take into account both the language of the contract and the inferences that can be drawn from that language. See id.

Thus, to grant summary judgment on a breach of contract claim, the Court must determine both (1) that there are no genuine issues of material fact that a party engaged or failed to engage in certain conduct, and (2) that such acts or omissions unambiguously breach the terms of the contract.

### b. Breach of Contract

Here, the heart of the dispute centers around two clauses: Seventh B and Seventh F. Seventh B permits Abadia Retuerta to terminate the contract if Kobrand fails to meet minimum sales requirements but cannot be invoked if Abadia Retuerta's production levels are too low to sell Kobrand the required quantity of wine. If Abadia Retuerta properly invoked Seventh B to terminate the contract, Abadia Retuerta would be entitled to liquidated damages from Kobrand. Seventh F, by contrast, permits Abadia Retuerta to terminate the contract without cause but requires it to pay liquidated

9

damages to Kobrand.  Whether the termination is based on Seventh B,
Seventh F, or neither depends, in turn, on a number of other provisions,
which Abadia Retuerta claims have been breached by Kobrand.

Rather than discuss each party's claims clause-by-clause, the Court
will discuss their contentions in the context of three general questions: (i)
whether Abadia Retuerta was entitled to terminate the contract under
Seventh B, (ii) if not, whether it was only entitled to terminate the contract
under Seventh F, and (iii) whether Kobrand breached any other provision of
the contract.

### i. Seventh B

Both parties claim to be entitled to summary judgment on the question
of whether Abadia Retuerta properly invoked section Seventh B to terminate
the contract.  In order to invoke that section to terminate, Abadia Retuerta
must show that (1) Kobrand failed to meet the Total SUPPLIER Annual
Floor Revenue for a relevant year, (2) Abadia Retuerta's production levels
were sufficient to supply Kobrand with enough wine to meet that revenue
floor, and (3) Abadia Retuerta's right to terminate existed at the time it
invoked that right.  Because Kobrand has raised a genuine issue of material
fact as to the third requirement, Abadia Retuerta's motion must be denied.
Because Abadia Retuerta has put forth compelling facts in support of each of
these requirements, Kobrand's motion must also be denied.

Section Seventh B permits Abadia Retuerta to terminate the contract
without penalty "if during any year [Abadia Retuerta] does not achieve at

least the Total SUPPLIER Annual Floor Revenue as set forth in Exhibit A to this agreement." (Agreement at 5.) However, it also requires Abadia Retuerta to provide sufficient wine for Kobrand to meet the quantities set forth in Exhibit A, unless "production levels in a particular year are not attainable due to forces outside [Abadia Retuerta]'s reasonable control." (Id.) Moreover, if Abadia Retuerta's "production levels in any year are not sufficient to permit [Abadia Retuerta] to provide to [Kobrand] the quantities set forth in Exhibit A, [Abadia Retuerta] shall not be entitled to enforce any of its rights under [section Seventh B]." (Id.)

The parties do not dispute that Kobrand failed to achieve the required Total SUPPLIER Annual Floor Revenue in 2008 and 2010. Nevertheless, Kobrand argues that it is entitled to summary judgment on this claim (and Abadia Retuerta is not) because, among other reasons:

1.  Abadia Retuerta may not terminate the agreement under Seventh B on the basis of any year other than 2010 because it did not invoke its right to do so within a "reasonable time" after Kobrand's alleged revenue shortfall for those years, see Savasta v. 470 Newport Assocs., 623 N.E.2d 1171, 1172 (N.Y. 1993); and

2.  Abadia Retuerta may not invoke section Seventh B to terminate the agreement on the basis of Kobrand's 2010 sales because Abadia Retuerta's production levels that year were insufficient to supply Kobrand with enough wine to meet its revenue target.

11

Because Kobrand raises genuine issues of material facts supporting both of these arguments, Abadia Retuerta is not entitled to summary judgment on this issue.

First, Kobrand argues that the Court must impose a "reasonable time" limit for Abadia Retuerta to "perform" under section Seventh B.  To this end, Kobrand cites <u>Savasta</u>, 623 N.E.2d at 1172, which held that where "a contract does not specify time of performance, the law implies a reasonable time."  The <u>Savasta</u> Court held that the plaintiffs' delay in exercising their to terminate a partnership triggered by the sale of an asset twenty-two months earlier was unreasonable.

Here, Kobrand argues that a delay from the end of 2008 or 2009 to mid-2011 is unreasonable as a matter of law.[2]  In light of Kobrand's consistent failure to meet the revenue targets contemplated by Exhibit A, the Court cannot agree.  Indeed, the Court would be inclined to find that any delay on Abadia Retuerta's part was reasonable, but for the New York state precedent holding that "[w]hat constitutes a reasonable time for performance depends upon the facts and circumstances of the particular case."  <u>Id.</u>  The Court therefore leaves the question of the reasonableness of Abadia Retuerta's timing for the jury to determine.  <u>See, e.g.</u>, <u>id.</u>; <u>Tedeschi v. Northland Builders, LLC</u>, 74 A.D.3d 1613, 1614 (N.Y. App. Div. 2010).

---

[2] Because Kobrand has raised a genuine issue of material fact as to the reasonableness of Abadia Retuerta's purported delay in terminating the agreement regardless of whether it could be terminated on the basis of 2009 or 2007 revenues, the Court need not decide whether Exhibit A imposed minimum revenue requirements for those years.

Second, Kobrand has also raised genuine issues of material facts as to whether Abadia Retuerta's production levels were sufficiently high in 2010 to invoke Seventh B.  Exhibit A permits the parties to meet the Total SUPPLIER Annual Floor Revenue by selling any combination of Palomar, Selección Especial, or Rívola.  (See Agreement at 11.)  To succeed on summary judgment for this claim, therefore, Abadia Retuerta must demonstrate that it had sufficient "production levels" to sell Kobrand $3,230,627 worth of some combination of those wines.  (See id. at 5, 11.) Kobrand has cited material that would allow a jury to find that Abadia Retuerta could not provide it with any Palomar in 2010 (see Cvjetkovic Aff. ¶¶ 10-11, 15, Exs. 6, 7, ECF No. 25) and could only provide it with 5,500 cases of Selección Especial that year (see id. Ex. 6).

At the prices listed in Exhibit A, that would require Abadia Retuerta to supply Kobrand with $2,719,127 worth of Rívola in 2010.  Because Abadia Retuerta's own documents indicated that its "total production available" of Rívola in 2010 was 47,691 cases (see Perez Decl. Ex. K, ECF No. 35) — or $2,747,001.6, based on the pricing in Exhibit A (see Agreement at 11) — and because Abadia Retuerta acknowledged that the United States represented only "a modest percentage" of its total sales (see Def.'s Reply Mem. Law Supp. Cross-Mot. Summ. J. 3, ECF No. 43), a jury could find that Abadia Retuerta's production levels in 2010 were insufficient to permit it to invoke

section Seventh B to terminate the agreement.  Abadia Retuerta's motion for summary judgment on this issue must therefore be denied.

Kobrand's motion for summary judgment on this issue must also be denied.  Abadia Retuerta has put forth ample evidence that would allow a jury to find that it properly invoked section Seventh B to terminate the agreement.  Looking at 2008 alone, Abadia Retuerta's production levels were high enough (see Perez Decl. Ex. K, ECF No. 35)  — and Kobrand's revenues low enough (see Valero Decl. ¶ 42, Ex. F, ECF No. 34) — to permit Abadia Retuerta to terminate on the basis of that year.  Indeed, if a jury found that Abadia Retuerta did not unreasonably delay its termination from that year, it would likely be entitled to a directed verdict on this issue.

### ii.  Seventh F

Kobrand does not merely claim that Abadia Retuerta may not invoke section Seventh B to terminate the contract.  It also argues that Abadia Retuerta's termination necessarily fell under section Seventh F and thus entitles Kobrand to liquidated damages.  Abadia Retuerta, for its part, argues that the termination was not under section Seventh F because that provision is applicable only at Abadia Retuerta's election.  Because there are disputed issues of material fact as to this claim, too, the Court again must deny summary judgment.

Section Seventh F provides in pertinent part: "Notwithstanding anything to the contrary contained herein, [Abadia Retuerta] may terminate this Agreement for any reason, on one year's prior written notice to

14

[Kobrand]; provided, however that, upon exercising such right of termination," Abadia Retuerta must pay liquidated damages to Kobrand. (Agreement at 6.)  Section Seventh F thus clearly contemplates that it is to be invoked by Abadia Retuerta, but also clearly imposes liquidated damages on Abadia Retuerta for exercising its option to do so.  To require that a termination properly made under another section of the contract be treated as a termination under Seventh F would thus violate the unambiguous language of Seventh F.  Yet to permit Abadia Retuerta to terminate the contract without relying on any other provision — and still avoid the liquidated damages of section Seventh F merely by declining to invoke that provision — would also violate the unambiguous implications of Seventh F.

The Court therefore finds as a matter of law that Abadia Retuerta terminated the contract under section Seventh F only if: (1) it specifically invokes Seventh F according to its terms, or (2) it terminates the contract without invoking Seventh F, but lacked the right to terminate under any other provision of the agreement.  Abadia Retuerta did not invoke section Seventh F in its notice of termination and has not taken the position that its termination was under section Seventh F for purposes of this litigation. Accordingly, only the second option is at issue here.

The Court's analysis above for section Seventh B is sufficient to preclude summary judgment in favor of Kobrand on this issue.  See supra section II.b.i.  If Abadia Retuerta might be entitled to terminate the contract

under section Seventh B, then there is a genuine issue of material fact as to whether it should be required to pay liquidated damages under section Seventh F. Because summary judgment for Kobrand was inappropriate under section Seventh B, it is inappropriate under section Seventh F, too.

Summary judgment in favor of Abadia Retuerta is also improper for this claim. Abadia Retuerta argues that it was entitled to terminate the contract under sections Seventh B and Seventh E — neither of which would require payment of liquidated damages to Kobrand. Since the Court found genuine issues of material fact existed as to whether Abadia Retuerta was entitled to terminate the contract under Seventh B, that section cannot provide a basis for summary judgment against Kobrand's claim under section Seventh F.

Moreover, Abadia Retuerta's argument that its termination was under section Seventh E is without merit. Section Seventh E permits either party to terminate the contract if: (1) the other party is in material default, and (2) the terminating party provides the defaulting party with written notice of the default and 120 days to cure the default. (Cvjetkovic Decl. Ex. 1 at 6, ECF No. 25.)

The deficiency in Abadia Retuerta's notice precludes summary judgment in its favor for this claim. Both parties agree that Abadia Retuerta provided notice of termination approximately seventy days prior to ceasing performance. (See Def.'s Mem. Law Opp'n Pl.'s Mot. Summ. J. 18, ECF No.

16

31; Pl.'s Mem. Law Supp. Mot. Summ. J. 19, ECF No. 28.)  Abadia Retuerta

argues that this notice was more than sufficient because, notwithstanding

the plain language of the contract, Kobrand was not entitled to any notice at

all.  Abadia Retuerta rests this argument on precedent that permits a party

to dispense with contractual notice requirements where notice would be

futile.  (See Def.'s Mem. Law Opp'n Pl.'s Mot. Summ. J. 18, ECF No. 31.)  In

support of that proposition, Abadia Retuerta cites to Drapkin v. MAFCO

Consolidated Group, Inc., 818 F. Supp. 2d 678, 689 (S.D.N.Y. 2011).  But as

the holding in that case makes clear, courts will only find notice to be futile

"where the non-performing party (1) expressly repudiated the parties'

contract, or (2) abandons performance thereunder."  Id. (quoting Point Prod.

A.G. v. Sony Music Entm't, Inc., No. 93 Civ. 4001, 2000 WL 1006236, at *4

(S.D.N.Y. July 20, 2000)).  Even if Abadia Retuerta were correct that

Kobrand breached the contract, nothing in the record suggests that Kobrand

expressly repudiated the contract or abandon performance.  Notice was

therefore not excused.

Abadia Retuerta also points to communications in which it both

complained to Kobrand that sales had been below those contemplated by the

contract and pointed out its right to terminate under section Seventh B.

(See, e.g., Valero Decl. Ex. C, ECF No. 34.)  But Abadia Retuerta mentions

these communications only in support of its argument for futility of notice.  It

does not contend that these communications, which were made well over 120

17

days before it ceased performance, constituted sufficient notice under section Seventh E.  Nor could it succeed on such an argument.  None of the communications it cites would have put Kobrand on notice that a failure to cure a material default within 120 days would result in termination of the contract.  Moreover, none of these communications mentioned section Seventh E or explicitly indicated Abadia Retuerta's intent to terminate the contract.  (See id. at Exs. A-D.)

Accordingly, the Court must deny both parties' motions for summary judgment as to this issue.

### iii.  Other Provisions

Finally, in its first memorandum of law in support of its motion for summary judgment, Abadia Retuerta asserts separate claims for breach of contract under at least four separate provisions of the agreement.  In particular, Abadia Retuerta claims that Kobrand breached the contract by:

(1)   Failing to meet the total annual floor revenue under Exhibit A;

(2)   Failing to prepare and submit annual marketing plans, as required by section First E;

(3)   Failing to abide by the price increases required by Exhibit A; and

(4)   Failing to negotiate an extension of Exhibit A beyond 2010, as required by sections Seventh B, Twelfth B, and Exhibit A.

In addition to Kobrand's alleged stand-alone breaches, Abadia Retuerta argues (in connection with its right to terminate under section Seventh E)

that Kobrand breached the contract by failing to meet target sales volumes and by failing to apply commercially reasonable efforts to market and sell Abadia Retuerta's wine, as required by section Second A.

Abadia Retuerta has not stated a claim with respect to any of these alleged breaches.  Under New York law, one element of a breach of contract claim is damages.  See Fischer & Mandell, LLP v. Citibank, N.A., 632 F.3d 793, 799 (2d Cir. 2011).  Hence, the "failure to prove damages . . . is fatal to [a] plaintiff's breach of contract cause of action." LNC Invs., Inc. v. First Fidelity Bank, N.A. N.J., 173 F.3d 454, 465 (2d Cir. 1999) (quoting Cramer v. Spada, 610 N.Y.S.2d 662, 664 (N.Y. App. Div. 1994)).  Abadia Retuerta points to no facts in its summary judgment papers that would permit a jury to find that it suffered damages as a result of any of these breaches.  Indeed, after Kobrand argued that the claims fail for lack of damages, Abadia Retuerta appeared to abandon its argument for summary judgment on the stand-alone claims for breach of contract.  (See Def.'s Reply Mem. Law Supp. Cross-Mot. Summ. J. 6-10, ECF No. 43 (discussing Kobrand's alleged breaches only in the context of terminating the contract under section Seventh E).)

Kobrand is therefore entitled to summary judgment on all of Abadia Retuerta's stand-alone claims for breach of contract, except as discussed above  in connection with section Seventh B.

### III.   CONCLUSION

For the foregoing reasons, Kobrand's motion for summary judgment is GRANTED in part and DENIED in part, and Abadia Retuerta's motion for summary judgment is DENIED.

The Clerk of the Court is directed to terminate the motions at docket numbers 23 and 30.

SO ORDERED.

Dated:      New York, New York
            November 19, 2012

                                        KATHERINE B. FORREST
                                        United States District Judge

# APPENDIX A

# DISTRIBUTION AGREEMENT

DISTRIBUTION AGREEMENT (the "Agreement") made as of this 7th day of September, 2005 between Abadía Retuerta S.A., a Spanish corporation located at 47340 Sardón de Duero, Valladolid, Spain (hereinafter referred to as "SUPPLIER"), and Kobrand Corporation, a New York corporation located at 134 East 40th Street, New York, New York, 10016, United States of America (hereinafter referred to as "KOBRAND").

WHEREAS:

I.   SUPPLIER is engaged in the production, and also in the sale, of certain wines under the brand names of "Abadía Retuerta Cuvée El Palomar", "Abadía Retuerta Selección Especial" and "Abadía Retuerta Rívola" (which wines are hereinafter referred to as the "Wine");

II.  SUPPLIER is desirous of giving to KOBRAND the sole and exclusive right to purchase and import the Wine for the purpose of resale in the United States of America inclusive of Hawaii and Alaska, Canada and in the Caribbean Basin and Bermuda (all of which areas are hereinafter referred to as the "assigned territory");

III. KOBRAND is desirous of being the exclusive importer and distributor of the Wine for and in the assigned territory upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, IT IS MUTUALLY AGREED AS FOLLOWS:

FIRST:

A.   SUPPLIER appoints KOBRAND as the sole and exclusive importer and distributor of the Wine in the assigned territory.

B.   SUPPLIER agrees not to sell, distribute, or make available, whether directly or indirectly or through any subsidiary, affiliated or associated company, to any other person or entity for sale or distribution in the assigned territory any Wine, whether under the brand name of  "Abadía Retuerta" or otherwise.

C.   SUPPLIER hereby grants to KOBRAND the right to use SUPPLIER's labels, trademarks and trade names associated with the Wines for the purpose of KOBRAND's selling, promoting the sale of, and advertising the Wines in accordance with this Agreement.

*Page 1 of 11*



D.    SUPPLIER hereby agrees to provide KOBRAND with US$2.00 per case, to be used for marketing of the Wine, for each case of Wine sold by KOBRAND during the period ending December 31, 2006. SUPPLIER further agrees to provide KOBRAND with US$1.00 per case, to be used for marketing of the Wine, for each case of Wine sold by KOBRAND during calendar year 2007. Such payment may be taken by KOBRAND as a credit against any amounts owed to SUPPLIER hereunder. All other marketing costs shall be the responsibility of KOBRAND.

E.    KOBRAND shall implement an annual marketing plan for the Wine in the assigned territory. Each year during the term of this Agreement, KOBRAND shall prepare a draft of the annual marketing plan by October 15 of the immediately preceding year for review by SUPPLIER. All advertising and promotional activities conducted by KOBRAND hereunder and thereunder shall not be detrimental to the name, goodwill or reputation of the Wine or of SUPPLIER. KOBRAND will promptly discontinue upon request any advertising or practice deemed by SUPPLIER to have, or be likely to have, any such detrimental effect.

F.    If SUPPLIER fails to achieve the total SUPPLIER Annual Target Revenue (as defined in Exhibit A) for any calendar year during the term of this Agreement, then KOBRAND shall expend at least US$7.00 per case (inclusive of any amounts provided by SUPPLIER pursuant to Paragraph D above) to market the Wine in all subsequent calendar years during the term of this Agreement until SUPPLIER achieves the total SUPPLIER Annual Target Revenue for a calendar year, and thereafter this paragraph shall continue to apply with respect to any future failures to achieve the total SUPPLIER Annual Target Revenue.

<u>SECOND</u>:

A.    KOBRAND hereby accepts said appointment as the sole and exclusive importer and distributor for the Wine in the assigned territory, and KOBRAND agrees to exercise its commercially reasonable best efforts to sell the Wine, in such quantities as are set forth on Exhibit A hereto, in the assigned territory. The suggested retail prices for the Wine in the assigned territory are set forth on Exhibit A hereto. Notwithstanding such suggested retail prices, KOBRAND shall set the resale price for the Wine in the assigned territory in its sole discretion.

B.    For the period ending December 31, 2009, KOBRAND agrees not to sell, distribute, or make available, whether directly or indirectly or through any subsidiary, affiliated or associated company, to any other person or entity for sale or distribution in the assigned territory any wine produced from the Ribera del Duero region of Spain, other than the Wines. Furthermore, for the period ending December 31, 2009, KOBRAND agrees not to sell, distribute, or make available, whether directly or indirectly or through any subsidiary, affiliated or associated company, to any other person or entity for sale or distribution in the assigned territory, the wines of more than two other suppliers of Spanish wine other than white, sparkling and Port-style wines (not including

*Page 2 of 11*

the SUPPLIER) or more than seven brands in total of  Spanish wine other than the Wine and white, sparkling and Port-style wines.

C.     KOBRAND shall (i) not sell or supply the WINE to any person located outside of the assigned territory and (ii) use commercially reasonable efforts to prevent the sale or supply of the WINE to any person within the assigned territory which KOBRAND knows or has reason to believe will sell or supply all or part of the WINE to another person located outside of the assigned territory.

THIRD:

A.     SUPPLIER shall sell the Wine to KOBRAND in accordance with such orders as may be placed by, or on behalf of, KOBRAND, or with its approval, at such prices as are determined by SUPPLIER from time to time in its sole discretion.  SUPPLIER's prices for the Wine shall be EX WORKS SUPPLIER's facilities in Spain.  KOBRAND shall be responsible for picking up all Wine ordered at SUPPLIER's facilities and shipping the Wine to its desired locations in the assigned territories.  KOBRAND and SUPPLIER will meet annually to review pricing and quantities from the previous year as well as discuss pricing and quantities for the coming year.   The parties acknowledge that, in order to achieve profitable sales of the Wine in the assigned territory, and subject to market conditions, the parties believe it necessary that SUPPLIER's prices be formulated assuming an average retailer's gross profit margin of 35%, an average wholesaler's gross profit margin of 20%, and a gross profit margin for KOBRAND of 25% with respect to the Rivola label and a gross profit margin of 30% with respect to the Palomar and Selección Especial labels. Notwithstanding the foregoing, the final decision on pricing shall lie with SUPPLIER.

B.     Each party will make available to the other party, annually upon request of the other party or in the event of a significant dispute, all information relevant to the marketing and selling of the Wines under this Agreement, including information which is confidential or commercially sensitive . In particular (but not as an all inclusive list), (i) KOBRAND will provide SUPPLIER with respect to the Wine information regarding quantities sold, pricing, marketing efforts and costs, etc. and (ii) SUPPLIER will provide KOBRAND with respect to the Wine information regarding productions costs, marketing costs and efforts, etc.

C.     SUPPLIER agrees to be responsible for returns of any Wine which is not merchantable or fit for human consumption, and to reimburse KOBRAND directly for such returns at KOBRAND's original laid-in cost, including freight, cartage and warehousing, if any.

D.     SUPPLIER and KOBRAND agree, to the extent legal and to the extent commercially feasible, to reasonably work out a mutually acceptable employee purchase plan, whereby documented employees of SUPPLIER located in the assigned territory would be entitled to purchase the Wines at an agreed upon discount.

*Page 3 of 11*

FOURTH:    For so long as this Agreement shall remain in effect, SUPPLIER shall not, with respect to the Wine of SUPPLIER being distributed by KOBRAND, and only with respect to the assigned territory, directly or indirectly, engage in any of the following activities on or through the Internet or other electronic or telephonic means:

(a)  solicitation of orders;

(b)  acceptance of orders; or

(c)  effecting sales of the Wine to any person or entity that acts or conducts business as consolidator of solicited orders from others.

FIFTH:    If at any time while this Agreement is in effect, SUPPLIER desires to engage in the business of receiving orders for the Wine, whether from individuals or entities engaged in the business of consolidating orders from others or otherwise, by or through the Internet or other electronic or telephonic means, then SUPPLIER shall so advise KOBRAND and KOBRAND shall undertake to act as SUPPLIER's agent for such purposes and shall, on behalf of SUPPLIER, fill all such orders.  In consideration for KOBRAND providing such services, KOBRAND shall receive its regular margin from SUPPLIER for each such order filled by KOBRAND.

SIXTH:

A.    SUPPLIER shall produce and bottle the Wine in compliance with the laws and regulations of the United States.  KOBRAND shall keep SUPPLIER reasonably informed of the laws and regulations of the United States applicable to the production and bottling of the Wine. SUPPLIER agrees to accept return of Wine not in such compliance at its own expense and to indemnify KOBRAND against all claims, costs, expenses, penalties, fines, judgments, settlements, demands, losses, damages, or liability incurred by KOBRAND as a result of Wine which is shipped without such compliance.

B.    KOBRAND shall import all Wine in compliance with the laws and regulations of the assigned territory.  Provided that SUPPLIER shall have complied with KOBRAND's instructions with respect to the importation of the Wine in the assigned territory and provided such claim of indemnity does not arise as a result of the wrongful actions of SUPPLIER, KOBRAND shall indemnify SUPPLIER against all claims, costs, expenses, penalties, fines, judgments, settlements, demands, losses, damages, or liability incurred by SUPPLIER as a result of Wine which is imported without KOBRAND's compliance with applicable laws and regulations or refused import as a result of failure of KOBRAND's compliance with applicable laws and regulations.

SEVENTH:

A.      This Agreement and all the terms and provisions thereof shall be deemed effective as of the first day of October, 2005, and shall continue in effect until the last day of December, 2020 (the "Initial Term"), unless sooner terminated as provided below.  This agreement shall be deemed further renewed from and after the last day of December, 2020 for subsequent ten-year periods; provided, however, that SUPPLIER may elect not to renew this Agreement upon giving written notice to KOBRAND at least two (2) years prior to the expiration of the then-effective term of this Agreement, and KOBRAND may elect not to renew this Agreement upon giving written notice to SUPPLIER at least one (1) year prior to the expiration of the then-effective term of this Agreement.  Any such termination in accordance with this paragraph shall not be subject to any penalty.

B.      Notwithstanding anything in this Agreement to the contrary, SUPPLIER may, but shall not be obligated to, terminate, without penalty, this Agreement if during any year SUPPLIER does not achieve at least the Total SUPPLIER Annual Floor Revenue as set forth in Exhibit A to this Agreement. In the event that SUPPLIER terminates this Agreement in accordance with this Paragraph B, KOBRAND shall pay to SUPPLIER, as liquidated damages and not as a penalty, an amount equal to 50% of the amount by which SUPPLIER's actual annual revenues from sales of the Wine in the assigned territory for such year is less than the Total SUPPLIER Annual Floor Revenue for such year as set forth on Exhibit A to this Agreement. For its part, SUPPLIER shall be obligated to sell to KOBRAND the quantities set forth in Exhibit A unless production levels in a particular year are not attainable due to forces outside of SUPPLIER's reasonable control. In the event that the production levels in any year are not sufficient to permit SUPPLIER to provide to KOBRAND the quantities set forth in Exhibit A, SUPPLIER shall not be entitled to enforce any of its rights under this paragraph, KOBRAND shall not be obligated to meet any of its threshold requirements set forth on Exhibit A, and KOBRAND shall receive its pro rata share of the Wines vis-à-vis all other worldwide distributors of the Wine.  Exhibit A may be modified as agreed by KOBRAND and SUPPLIER.

C.      In the event that SUPPLIER produces two consecutive vintages of unmerchantable Wine, KOBRAND shall have the right within one hundred twenty (120) days of the final determination of such event , to terminate this Agreement on three (3) months' written notice.  In the event of any dispute between the parties regarding the merchantability of any Wine, the parties shall submit the dispute for arbitration to a panel of three independent arbitrators who shall have experience in the field of wine for final determination.  Each party shall select one member of the panel, and the two panelists selected by the parties shall jointly select the third member.

D.      This Agreement may be terminated by either party upon thirty (30) days' written notice if the other party ("Bankrupt Party") becomes insolvent or bankrupt or a receiver or trustee is

*Page 5 of 11*

appointed for the Bankrupt Party or the Bankrupt Party makes an assignment for the benefit of creditors.

E.      Except as otherwise provided in this Agreement, either party may terminate this Agreement upon one hundred twenty (120) days' written notice to the other party if such other party is in material default of this Agreement and such default is not cured within said one hundred twenty (120) day period.

F.      Notwithstanding anything to the contrary contained herein, SUPPLIER may terminate this Agreement for any reason, on one year's prior written notice to KOBRAND; provided, however that, upon exercising such right of termination, SUPPLIER shall pay to KOBRAND, as liquidated damages and not as a penalty, the following amounts:

| Year of Termination | | Payment Amount |
|---|---|---|
| Years 1-2 of the term | | No Payment |
| | | |
| Years 3-7 of the term | | 3 x "Profits" |
| | | |
| Years 8-11 of the term | | 2.5 x "Profits" |
| | | |
| Years 12-13 of the term | | 2 x "Profits" |
| | | |
| Years 14-15 of the term | | 1/12 of "Profits" for each month remaining in the term. |

For purposes of this paragraph, "Profits" is defined as KOBRAND's annual profits (sales price less cost of goods sold) relating to the Wine for the most recently concluded calendar year, "Year 1" shall be the period beginning on the date hereof and ending on December 31, 2006, and each subsequent "Year" shall be the next calendar year.

<u>EIGHTH:</u>

A.      KOBRAND will ensure that copyright in any advertising, promotional and other similar materials, including but not limited to brand name, logos and slogans, produced by or on behalf of KOBRAND hereunder that are used to promote the Wine and contain any brand name or trademark of SUPPLIER, other than such advertising, promotional and similar materials that are



*Page 6 of 11*

used to promote Spanish wines in general, is vested exclusively at all times in SUPPLIER. At the request and expense of SUPPLIER, KOBRAND will take all steps that SUPPLIER reasonably requires to assist SUPPLIER in obtaining such copyright and other intellectual property right protection for intellectual property rights to SUPPLIER.

B.      SUPPLIER and KOBRAND acknowledge that it is of the utmost importance to protect SUPPLIER's trademarks against unfair competition, disparagement, infringement and/or dilution. KOBRAND shall promptly notify SUPPLIER in writing of any infringement of the trademarks or of any act of unfair competition by third parties relating to the trademarks, whenever such infringement or act shall come to KOBRAND's attention. SUPPLIER will take whatever action (if any) it deems necessary under the circumstances and will have sole control over any resulting proceedings. KOBRAND will, at the request and expense of SUPPLIER, do all such things as may be reasonably required to assist SUPPLIER in taking or resisting any proceedings in relation to any such infringement or claim.

NINTH:

A.      SUPPLIER shall maintain adequate product liability insurance and have KOBRAND named as an insured under such insurance policy.  SUPPLIER shall submit annually to KOBRAND written evidence of such insurance and of KOBRAND's designation as an insured.

B.      Notwithstanding any failure by SUPPLIER to obtain such insurance coverage, SUPPLIER shall indemnify and hold KOBRAND harmless from and against any claim, cost, expense, penalty, fine, judgment, settlement, demand, loss, damage, or liability of any kind arising out of or relating to SUPPLIER's negligence, recklessness or willful misconduct.

C.      KOBRAND agrees to indemnify and hold SUPPLIER harmless from and against any claim, cost, expense, penalty, fine, judgment, settlement, demand, damage, loss or liability of any kind arising out of or relating to KOBRAND's negligence, recklessness or willful misconduct.

D.      In no event will either party hereto be liable to the other party for consequential, special, punitive, incidental or indirect losses or damages of any kind whatsoever (including but not limited to lost profits), even if said party has been advised of the likelihood of such loss or damage and regardless of the form of action.

TENTH:      Any demand, notice, or request provided for by this Agreement shall be in writing, and shall be made by personal delivery or by certified or registered mail or overnight courier addressed to the party to whom notice is to be given or to whom demand or request is to be made, said certified or registered mail or courier to be addressed to said party at the address of such party hereinabove set forth.

*Page 7 of 11*

ELEVENTH:  This Agreement shall be construed by and interpreted in accordance with the laws of the State of New York, without regard to its rules regarding conflict of laws.   Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement shall be brought in the courts of the State of New York, County of New York or the United States District Court for the Southern District of New York, and SUPPLIER consents to jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein.

TWELFTH:

A.      This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof, and supersedes any other arrangement or agreement heretofore made by the parties with respect to the subject matter hereof not expressly set forth herein. This Agreement may not be amended or modified except by written instrument signed by each of the parties.

B.      The parties hereto shall execute such other documents, authorizations or other instruments as may be necessary or proper to effectuate and fully carry out the provisions of this Agreement.

C.      Subject to the limitations of paragraph E below, the rights and obligations established by this Agreement shall inure to the benefit of and bind the parties and their respective successors, assigns, distributors, and legal representatives.

D.      This Agreement does not constitute either party as the agent or legal representative of the other party for any purpose whatsoever. Neither party is granted any right or authority to assume or to create any obligation or responsibility, express or implied, on behalf of or in the name of the other party, or to bind the other party in any manner.

E.      Each party has entered into this agreement solely in reliance upon the unique characteristics and services of the other party. Therefore, neither party may assign any of its rights or obligations under this Agreement without the prior written consent of the other party; provided, however, that nothing contained herein shall preclude assignment to any successor entity the majority of which is owned by that party and which does business under the name of that party.

F.      If any provision of this Agreement is held by a court of competent jurisdiction to be invalid, void, or unenforceable, then as to that jurisdiction, that provision shall be deemed severed from this Agreement, and the remainder of this Agreement shall continue in full force and effect.

G.      This Agreement may be executed in counterparts, which together shall constitute one original agreement.

*Page 8 of 11*

### THIRTEENTH:

A.    KOBRAND and SUPPLIER anticipate that certain Confidential Information (as defined below) of a disclosing party ("Disclosing Party") might be disclosed or become known to a receiving party ("Receiving Party") in connection with this Agreement.

B.    Confidential Information excludes any information and/or material that: (a) was publicly known prior to disclosure by the Disclosing Party; (b) becomes publicly known through no fault of the Receiving Party or any party receiving such information or material from or on behalf of the Receiving Party; (c) was rightfully obtained by the Receiving Party from a third party with the right to transfer or disclose such information or material; or (d) was independently developed by the Receiving Party without reference to or use of such Confidential Information.

C.    The Receiving Party agrees: (a) to use Confidential Information only for the purposes of this Agreement; and (b) that it may disclose Confidential Information to employees, directors, auditors and professional representatives with a need to know such Confidential Information, but that it shall not disclose such Confidential Information to any other third party (including affiliates and contractors) except with prior written approval of the Disclosing Party. Confidential Information may be disclosed by a Receiving Party pursuant to a court order, provided that the Receiving Party provides the Disclosing Party prompt written notice of such requirement and cooperates with the Disclosing Party to contest or limit the scope of such request. The obligations of the Receiving Party hereunder shall survive expiration or termination of this Agreement and be binding upon such Party's heirs, successors and assigns until such time as all Confidential Information of the Disclosing Party is no longer deemed confidential under the provisions of Section "THIRTEENTH (B)" above.

D.    All documents, materials, objects and media containing a Disclosing Party's Confidential Information, including copies thereof, and any and all Intellectual Property Rights thereto, that are in the possession or control of the Receiving Party, shall, as between the Parties, be the sole and exclusive property of the Disclosing Party and shall be promptly returned to the Disclosing Party, or, destroyed, upon termination or expiration of this Agreement.

E.    "Confidential Information" means any oral or written information and/or materials, documents, financials, and all other information, including information based on visual observations or presentations, concerning the Disclosing Party, whether or not designated as "confidential" or "proprietary".

IN WITNESS WHEREOF, the parties hereto have hereunto duly executed this Agreement as of the day and year first above written.

*Page 9 of 11*

**KOBRAND CORPORATION**

Attest:

BY: _____

Name: Charles J. Palombini
Title:   President & CEO

_____

**ABADÍA RETUERTA S.A.**

Attest:

BY: _____

Name: Donald Cusimano
Title:   General Manager

_____

Case 1:12-cv-00154-KBF  Document 25-1  Filed 07/30/12  Page 12 of 12

Prepared: 8/2005

Exhibit A
Attachment to Distribution Agreement

## ABADIA RETUERTA & KOBRAND CORPORATION

| | Calendar Year | Quantity Commitment Target | Quantity Commitment Floor (70%) | Supplier Price ex-works | Retail price range Front | Retail price range Volume | SUPPLIER Annual Target Revenue 2006 CV | SUPPLIER Annual Target Revenue 2008 | SUPPLIER Annual Target Revenue 2010 and beyond | SUPPLIER Annual Floor Revenue 2006 CV | SUPPLIER Annual Floor Revenue 2008 | SUPPLIER Annual Floor Revenue 2010 and beyond |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Rivola** | | | | | | | | | | | | |
| 12x750ml | 2006 | 10000 | 10000 | $57.60 | $14.99 | $11.99 | $576'000 | | | $576'000 | | |
| 12x750ml | 2008 | 14'285 | 19999 | $57.60 | $14.99 | $11.99 | | $822'816 | | | $575'971 | |
| 12x750ml | 2010 | 28'570 | 19999 | $57.60 | $14.99 | $11.99 | | | $1'645'632 | | | $1'151'942 |
| **Selección Especial** | | | | | | | | | | | | |
| 12x750ml | 2006 | 3000 | 6003 | $84.00 | $21.99 | $17.99 | $252'000 | | | $252'000 | | |
| 12x750ml | 2008 | 8'575 | 12005 | $84.00 | $21.99 | $17.99 | | $720'300 | | | $504'210 | |
| 12x750ml | 2010 | 17'150 | | $93.00 | $24.99 | $19.99 | | | $1'594'950 | | | $1'116'465 |
| **Pago Palomar** | | | | | | | | | | | | |
| 6X750ml | 2006 | 4000 | 4144 | $100.80 | $52.99 | | $403'200 | | | $403'200 | | |
| 6X750ml | 2008 | 5925 | 8295 | $100.80 | $52.99 | | | $597'240 | | | $418'068 | |
| 6X750ml | 2010 | 11'850 | | $116.00 | $59.99 | | | | $1'374'600 | | | $962'228 |
| **Total supplier annual target revenue** | | | | | | | $1'231'200 | $2'140'356 | $4'615'182 | | | |
| **Total supplier annual floor revenue** | | | | | | | | | | $1'231'200 | $1'498'249 | $3'230'627 |

There is a mutual understanding of the SUPPLIER's wish to attain a revenue of $3.5m by 2010, which is based on a goal of break-even. If the completion of the stated floor revenues may be otherwise achieved (by adjusting the case quantities by type), it represents an equally acceptable scenario. 2010 pricing depicted above may not reflect reality, as pricing will be reviewed on an ongoing basis, with the mutually-agreed goal of achieving at least the increased suggested retail shelf prices indicated by 2010.





Page 11 of 11